Catherine Norwood **WINTERS, acting By and Through her attorney-in-fact, Toni Louise McMAHON, Plaintiff–Appellant,**

v.

**GEORGE MASON BANK; Robert O. Tyler, Trustee, Defendants– Appellees.**

No. 95–2635.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1996.

Decided Aug. 23, 1996.

**ARGUED:** John Minh Tran, Greenberg, Bracken & Tran, Alexandria, Virginia, for Appellant.  Michael Lee Zupan, Hazel & Thomas, P.C., Alexandria, Virginia, for Appellees.  **ON BRIEF:** H. Bradley Evans, Jr., Hazel & Thomas, P.C., Alexandria, Virginia, for Appellees.

Before RUSSELL and MICHAEL, Circuit Judges, and NORTON, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion.  Judge NORTON wrote the opinion, in which Judge RUSSELL and Judge MICHAEL joined.

## OPINION

NORTON, District Judge:

This case involves the validity of a bank's security interest in stocks held jointly by the Plaintiff Mrs. Winters and her daughter Mrs. McMahon, which were pledged to the bank by Mrs. McMahon and her husband for a series of loans upon which they have defaulted.  Because this court finds that the bank has a valid security interest in the stocks pursuant to the 1992 pledge agreement signed by Mrs. Winters, we affirm the decision of the district court.

### I.

On March 30, 1990, Defendant George Mason Bank ("the Bank") approved a loan to Mr. and Mrs. McMahon in the form of a $200,000 secured line of credit to be used as

working capital for Mr. McMahon's real estate development business. The McMahons signed a business loan agreement on April 4, 1990. (J.A. 367). As collateral, the parties executed a commercial pledge agreement in which Mrs. Winters and Mrs. McMahon granted the Bank a security interest in stocks they held as joint tenants with rights of survivorship ("the Winters stocks"), which had an aggregate market value of at least $300,000.[1] (J.A. 372).

On April 20, 1990, the Bank approved a $25,000 extension to the McMahons' line of credit. The McMahons pledged additional collateral to the Bank in the form of $70,000 worth of securities ("the McMahon stocks"),[2] as reflected in the collateral pledge agreement signed by the McMahons on May 4, 1990. Additionally, Mrs. Winters signed a second commercial pledge agreement dated May 4, 1990, which is identical to the April pledge agreement except that it secures loan # 7027168 in the amount of $225,150.00. (J.A. 467).

On October 26, 1990 the Bank and the McMahons signed a change in terms agreement in which additional McMahon stock was pledged to extend the maturity of loan # 7027168. (J.A. 395). On May 31, 1991, the Bank approved an extension of the McMahons' credit line to $295,000. This third loan was designed to combine the balance of the existing line of credit with new funds advanced to pay a $67,819.99 note due to Independent Bank of Manassas, Virginia. (J.A. 405–6). Unlike the first two notes which were for revolving lines of credit, this note was a variable rate, one-year loan, with the full principal due within 12 months and interest payable monthly. The June 5, 1991 business loan agreement for loan # 7035764 was not signed by Mrs. Winters.[3]

On September 16, 1991, the McMahons signed a promissory note in the amount of $56,500. This note stated that it was secured by the Winters and McMahon stocks in accordance with the commercial pledge agreements of May 4, 1990 and October 26, 1990, and was designed to refinance the interest and fees on a previous loan which was sold to Independent Bank. (J.A. 411–12).

On January 31, 1992, the McMahons filed a joint Chapter 11 Bankruptcy Petition. (J.A. 566–67). The McMahons and the Bank entered into a stipulation on June 1, 1992 that the McMahons were indebted to the Bank for the June 1991 note in the sum of $295,000, and for the September 1991 note in the sum of $56,000. (J.A. 694–697). The stipulation further provided that both notes were secured by the Winters and McMahon stocks as reflected in the collateral pledge agreements of April 1990 and October 1990. Finally, the stipulation provided that the McMahon stocks would be sold, the proceeds reducing the indebtedness and creating an insurance reserve, and the Winters stocks would "remain pledged to the Bank as security for the repayment of the Indebtedness." (J.A. 697). The bankruptcy court entered an order approving the stipulation regarding relief from the stay and postpetition financing, and incorporating it into the order. (J.A. 692–93).

By a change in terms agreement signed by the McMahons on June 5, 1992, the McMahons' loan of $293,633.58 was extended one year and assigned the number 7035764. At that time, Mrs. Winters signed a new commercial pledge agreement in which she repledged the same Winters stocks previously covered by the April and May 1990 commercial pledge agreements as collateral for loan # 7035764.

1. The Winters stocks pledged in the April 4, 1990 loan agreement are:
   652 shares of BellSouth Corporation
   268 shares of Aetna Life Insurance Company
   12,132 shares of Fleet/Norstar Financial Group, Inc.
   1,408 shares of Sears, Roebuck & Co.
   (J.A. 375).

2. The description of the collateral for the May 4, 1990 loan agreement is as follows:
   800 shares of BellSouth Corporation

366 shares of American Telephone & Telegraph
100 shares of Martin Marietta.
(J.A. 389).

3. The bankruptcy court specifically found that the Winters stocks are not security for the McMahons' outstanding indebtedness of approximately $7,000.00 remaining from the previous loan by Independent Bank. (J.A. 325).

In summary, Mrs. Winters signed a total of three commercial pledge agreements pledging as collateral her interest in the Winters stocks. On April 4, 1990, she pledged those stocks as collateral for loan # 7026706 in the amount of $200,150. (J.A. 464). On May 4, 1990, she pledged those stocks as collateral for loan # 7027168, which increased the McMahons' loan to $225,150. (J.A. 467). And on June 5, 1992, she pledged those stocks as collateral for loan # 7035764, with principal of $293,633.58. (J.A. 470).

On November 1, 1994, Mrs. Winters brought this action against the Bank, claiming that the Bank converted the stocks, that the stocks were wrongfully transferred to the Bank under Virginia law, and that her pledges of the stocks were invalid and unenforceable. After a non-jury trial on July 10, 1995, Judge Leonie M. Brinkema issued an order on July 17, 1995, finding that Mrs. Winters' signatures on the pledge agreements were genuine, and that the Bank had a valid, perfected and enforceable security interest in the Winters stocks.

## II.

Mrs. Winters' basis for challenging the district court's decision is that (1) the 1992 collateral pledge represented an unapproved postpetition transfer and was thus void *ab initio;* and (2) the documents signed prior to 1992 were insufficient to create a security interest in the Winters stocks. Mrs. Winters concedes that if the court disagrees with her former contention, it need not reach the latter.

■ The filing of a bankruptcy petition "operates as a stay, applicable to all entities, of … (4) any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4) (1993 & Supp. 1996). The purpose of the automatic stay, in addition to protecting the relative position of creditors, is to shield the debtor from financial pressure during the pendency of the bankruptcy proceeding. *In re Stringer,* 847 F.2d 549 (9th Cir.1988). In *Williford v. Armstrong World Indus.,* 715 F.2d 124 (4th Cir.1983), this court considered the comments of the Committee on the Judiciary:

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from its creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

*Williford,* at 127 (quoting S.Rep. No. 95–989, 95th Cong., 2d Sess. 54–55 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5840–41).

Mrs. Winters argues that because she and Mrs. McMahon jointly owned the Winters stocks, those stocks were part of the bankruptcy estate. Mrs. Winters also argues that the 1992 pledge agreement was an act to create or perfect a lien against that property, and thus violated the automatic stay provision. Finally, Mrs. Winters argues that because the pledge agreement was in violation of the automatic stay, the agreement is void rather than merely voidable, and cannot provide the basis for the Bank's interest in the Winters stocks.

There are several problems with the Appellant's argument. First, as a non-bankrupt co-owner of property, Mrs. Winters lacks standing to challenge the purported violation of the automatic stay. Second, Mrs. Winters' interest in the stocks was not part of the bankruptcy estate. Third, the 1992 pledge agreement, voluntarily entered into by the debtors and by Mrs. Winters, benefited the bankruptcy estate and is thus not within the purpose of the automatic stay.

## A.

■ It is well settled that the automatic stay does not apply to non-bankrupt codebtors, *Williford v. Armstrong World Indus.,* 715 F.2d 124, 126 (4th Cir.1983), nor does the automatic stay prevent actions against guarantors of loans. *Credit Alliance Corp. v. Williams,* 851 F.2d 119, 121 (4th Cir.1988). In *A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986), this court noted a narrow exception to the general rule that the automatic stay is not available to third parties:

[I]n order for relief for such non-bankrupt defendants to be available under (a)(1), there must be "unusual circumstances".... This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.

*Id.* at 999 (citations omitted). This case does not present such an unusual situation. On the contrary, the debtors in this case, Mr. and Mrs. McMahon, voluntarily entered into and benefited from the transaction of which Mrs. Winters complains.

This court's decision in *Credit Alliance Corp.* is instructive. In that case, Penn Hook Coal Company had signed a conditional sales contract note with Croushorn Equipment Company, who assigned the note to Credit Alliance. Gary and Malcolm Williams ("the guarantors") executed a guaranty of Penn Hook's obligation in favor of Credit Alliance. When Penn Hook defaulted on its obligation, Credit Alliance filed suit against Penn Hook and the guarantors. Meanwhile, Penn Hook petitioned for bankruptcy. Thereafter, the district court entered a default judgment against the three defendants in the district court action.

When Credit Alliance instituted garnishment proceedings against Penn Hook and the guarantors in district court, the matter was referred to the bankruptcy court which held that the automatic stay provision of the bankruptcy code rendered void the default judgment against all three defendants. The district court reversed the bankruptcy court's action with respect to the guarantors, holding that Credit Alliance's claim against the guarantors was not stayed or void.

In affirming the district court's decision, this court noted that the automatic stay applies only to actions against the debtor or the property of the estate, and that the stay does not apply to guarantors of bankrupt debtors:

Nothing in § 362 suggests that Congress intended that provision to strip from the creditors of a bankrupt debtor the protection they sought and received when they required a third party to guaranty the debt. Congress knew how to extend the automatic stay to · non-bankrupt parties when it intended to do so. Chapter 13, for example, contains a narrowly drawn provision to stay proceedings against a limited category of individual cosigners of consumer debts. See 11 U.S.C. § 1301(a). No such protection is provided to the guarantors of Chapter 11 bankrupts by § 362(a).

*Id.* at 121. So this court found that an action against the debtor and the guarantors after the bankruptcy petition was filed violated the automatic stay only with respect to the debtor. The action was valid with respect to the guarantors. Similarly, even if this agreement were to violate the stay as to the McMahons, the agreement did not violate the stay as to Mrs. Winters.

## B.

■ Mrs. Winters argues that because the pledge agreement was an attempt to perfect a lien against property of the estate, her standing to enforce the automatic stay arises by virtue of her co-ownership of that property. Section 541 of the Bankruptcy Code defines property of the estate very broadly, including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1993).

There is a dearth of case law in this circuit on the issue of rights to jointly held property when one co-owner declares bankruptcy. Most courts find that the debtor's interest in property jointly held by a nondebtor becomes property of the estate upon the filing of the bankruptcy petition, but that the nondebtor's interest is not property of the estate. *See In re Gorman,* 159 B.R. 543 (Bankr.9th Cir.1993) (Debtor's property was held in joint tenancy rather than as community property, so only one half of sales proceeds was included in property of debtor-husband's bankruptcy estate); *In re Roberge,* 188 B.R. 366 (E.D.Va.1995) (Property co-owned with non-debtor spouse is part of bankruptcy estate, but when bankruptcy proceeding is commenced after vesting of equitable distribution rights, only debtor's inchoate equitable interest in marital estate becomes

part of bankruptcy estate); *In re Becker*, 136 B.R. 113 (Bankr.D.N.J.1992) (Only debtor's interest in property co-owned with nondebtor spouse becomes property of estate upon filing of bankruptcy petition); *In re Fey*, 91 B.R. 524 (Bankr.E.D.Mo.1988) (Chapter 7 debtor's half interest in stocks jointly held by nondebtor spouse was property of estate); *In re Nicholson*, 90 B.R. 64 (Bankr.W.D.N.Y. 1988) (Upon filing of petition, debtor's unliquidated, contingent interest in jointly held property became part of the estate; the proceeds of sale did not); *In re Tyson*, 48 B.R. 412 (Bankr.C.D.Ill.1985) (Bankruptcy estate of debtor had one half interest in debtor's jointly held property). Applying this reasoning, Mrs. Winters' interest in her stocks was not part of the bankruptcy estate, so the automatic stay could not have prevented the Bank from seeking her signature on the 1992 collateral pledge agreement.

This court declines to decide the exact extent of Mrs. McMahon's interest in the Winters stocks, noting that in the opinion below the district court urged the bankruptcy court to revisit this issue, but that the bankruptcy court has apparently not done so.[4] Regardless of the extent to which the stocks were part of the bankruptcy estate, this court finds that Mrs. Winters lacks standing to challenge the 1992 pledge agreement as violative of the automatic stay.

**4.** On October 19, 1994, the bankruptcy court heard Mrs. McMahon's motion to abandon her interest in the Winters stocks. Mrs. Winters and Mrs. McMahon testified that Mrs. McMahon never received dividends from the stocks, that Mrs. Winters was their sole beneficial owner, and that the stocks were of nominal value only to Mrs. McMahon. The bankruptcy court granted the motion. On March 6, 1995, the Trustee moved for relief from that order, arguing that he had newly discovered evidence that Mrs. McMahon did receive dividends from the stock shares. The bankruptcy court granted the Trustee's motion and vacated its previous order. (Defs.' Ex. 50). At the trial below, Mrs. McMahon testified that she had recently discovered that her husband had been forging her name on their joint tax returns as well as on other documents from the inception of their marriage in 1956. In its final order the district court stated,

Given that these are allegations of outright forgery by John F. McMahon, Jr. involving some of the documents relied upon by the Bankruptcy Court in vacating its original order, and in order to serve the interest of jus-

## C.

Finally, Mrs. Winters' attempt to use the automatic stay to her own benefit contradicts the purpose behind the stay provision. In *In re Globe Investment & Loan Co.*, 867 F.2d 556 (9th Cir.1989), a case factually similar to this one, co-owners of property with a Chapter 7 debtor challenged the bankruptcy trustee's sale of the debtor's interest in the property to a third party. The court found that the co-owners lacked standing to contest the trustee's sale as violative of the automatic stay:

The appellants' cause of action under section 362 is a disingenuous attempt to use the Bankruptcy Code to their advantage. The appellants' request for relief shows them to be aggrieved property owners with interests adverse to the estate, not creditors. Whatever argument may be made for extending the protection of section 362 to creditors, it clearly does not confer any rights to outside parties. . . .

The appellants have attempted to use section 362 as a weapon against the estate. The legislative history behind section 362 clearly states that section 362 is intended to protect the debtor and to assure equal distribution among creditors. As the

tice, this Court urges the Bankruptcy Court to revisit the issue concerning Mrs. McMahon's interest in the stocks.

(J.A. 337). After the district court made its decision, the bankruptcy court issued an order lifting the automatic stay and allowing the Bank to proceed with foreclosure on the Winters stocks. In that order, dated October 5, 1995, the court noted that "Catherine N. Winters contests any interest in the Stocks claimed by Catherine W. McMahon and/or the Estate in Bankruptcy, asserting the Stocks are the sole property of Catherine N. Winters." Upon Mrs. Winters' motion for reinstatement of the court's order abandoning the stocks titled in her name and that of her daughter, the court noted that the Bank has obtained a judgment enforceable against the stocks, and an order granting relief from the stay to foreclose on the stocks. The bankruptcy court found that therefore "no interest in the stocks titled in the names of Catherine Norwood Winters and Catherine W. McMahon as joint tenants with the rights of survivorship is henceforth vested in the Plan Trustee." Thus, the bankruptcy court never revisited the issue of the extent of Mrs. McMahon's interest in the stocks.

plaintiff's claim is antagonistic to the express purpose behind section 362, we find it to be wholly without merit.

*Id.* at 560 (citations omitted). Similarly, Mrs. Winters seeks to use the automatic stay to void an agreement that was beneficial to the bankruptcy estate, and that she and the debtors voluntarily entered into. Section 362 is a shield, not a sword.

### D.

■ Finally, Mrs. Winters argues that the automatic stay rendered the agreement itself void, so her status as to that agreement is immaterial. Mrs. Winters invites this court to decide, for the first time, whether it will follow those circuits who find the automatic stay renders actions void, or those circuits who find the automatic stay renders an action merely voidable.[5] The Third, Fifth, Sixth, and Eleventh Circuits have decided that actions taken in violation of an automatic stay are voidable rather than void.[6] The Second, Ninth, and Tenth Circuits have held that such actions are void.[7] This court declines to address this issue, finding that Mrs. Winters lacks standing to challenge the agreement as either void or voidable, because she is not the debtor and her interest in the stocks was not part of the bankruptcy estate.

### III.

As the Appellant concedes, "If this Court decides the 1992 documents are effective and enforceable against Mrs. Winters, then her appeal fails and further inquiry is unnecessary." (Br. of Appellant, at 23). For the reasons stated above, the decision of the district court is

*AFFIRMED.*

---

**5.** *See, Khozai v. Resolution Trust Corp.,* 177 B.R. 524 (E.D.Va.1995) (noting that the Fourth Circuit has not yet addressed the issue of whether actions taken in violation of the automatic stay are voidable rather than void, and deciding to follow the weight of authority which holds that such actions are merely voidable).

**6.** *See, In re Siciliano,* 13 F.3d 748, 751 (3d Cir. 1994); *Picco v. Global Marine Drilling Co.,* 900 F.2d 846 (5th Cir.1990); *Easley v. Pettibone Michigan Corp.,* 990 F.2d 905, 909–911 (6th Cir. 1993); *In re Albany Partners, Ltd.,* 749 F.2d 670, 675 (11th Cir.1984).

**7.** *See, Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522 (2d Cir.1994); *In re Schwartz,* 954 F.2d 569 (9th Cir.1992); *Ellis v. Consolidated Diesel Elec. Corp.,* 894 F.2d 371 (10th Cir.1990).